# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHRISTIANA CARE HEALTH SERVICES, INC. and CHRISTIANA CARE HEALTH SYSTEM, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2024-0802-LWW |
| JOHN CARNEY, in his official capacity as Governor of Delaware; NANCY FAN, in her official capacity as Chair of the Delaware Health Commission; JOSETTE D. MANNING, in her official capacity as Secretary of the Department of Health and Social Services; BOARD MEMBER #1, BOARD MEMBER #2, BOARD MEMBER #3, BOARD MEMBER #4, BOARD MEMBER #5, BOARD MEMBER #6, and BOARD MEMBER #7, each in his or her official capacity as a member of the Diamond State Hospital Cost Review Board. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 10, 2025
Date Decided: May 30, 2025

Catherine G. Dearlove & John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Ilana H. Eisenstein, Ben Fabens-Lassen & Marie Bussey-Garza, DLA PIPER LLP, Philadelphia, Pennsylvania; Samantha L. Chaifetz, DLA PIPER LLP, Washington, D.C.; *Counsel for Plaintiffs Christiana Care Health Services, Inc. and Christiana Care Health System, Inc.*

Kurt M. Heyman, Gillian L. Andrews & Luke P. Edwards, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Defendants John Carney, Nancy Fan, and Josette D. Manning*

**WILL, Vice Chancellor**

This case involves a challenge to House Bill 350, now codified at 16 *Del.* §§ 9951-59. The legislation created the Diamond State Hospital Cost Review Board, which is a state-appointed body empowered to oversee hospital budgets. The plaintiffs—two corporations that operate a regional hospital system—claim that the statute violates the Delaware and United States Constitutions.

The Review Board is not fully empaneled and has yet to pass implementing regulations. As a result, most of the plaintiffs' claims are unripe and dismissed without prejudice. One ripe claim on equal protection grounds is non-viable and dismissed with prejudice.

The other ripe claim survives. The plaintiffs allege that the statute is a "special act" barred by Article IX of the Delaware Constitution because it only affects a subset of hospital corporations. They alternatively allege that the statute is a corporation law that implicitly amends their charters but failed to secure the requisite supermajority legislative vote.

Both theories have merit. In Delaware, the managerial power of boards of directors is sacrosanct. The plaintiffs adequately plead that the legislation conceivably placed the Review Board atop their own boards, usurping the directors' authority to set corporate strategic prioritizes. The motion to dismiss this claim is denied.

1

## I.    FACTUAL BACKGROUND

The following facts are drawn from the Complaint, the documents it incorporates by reference, and matters subject to judicial notice.[1]

### A.    ChristianaCare

Plaintiff Christiana Care Health Services, Inc. ("Health Services") and its sole member, Christiana Care Health System, Inc. ("Health System" and, with Health Services, "ChristianaCare") are tax-exempt Delaware non-stock member corporations.[2]

ChristianaCare operates a private, non-profit, regional hospital system with locations in Delaware, Pennsylvania, and Maryland.[3]  Its non-profit teaching health system has hundreds of residents and fellows, and thousands of caregivers.[4]  It is the largest non-governmental employer in the State of Delaware.[5]

---

[1] Verified Am. Compl. for Decl. and Inj. Relief (Dkt. 30) ("Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a [petitioner] expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]") (citation omitted); *see also In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

[2] Compl. ¶ 28.

[3] *Id.*

[4] *Id.* ¶ 32.

[5] *Id.* ¶ 33.

ChristianaCare's operations are overseen by the Health Services' and Health System's boards of directors (together, the "Boards").[6]

## B. The Lead-Up to House Bill 350

In 2017, the Delaware General Assembly passed a joint resolution recognizing that healthcare spending in Delaware exceeded the national average.[7] The resolution directed the Department of Health and Social Services ("DHSS") to study data-gathering practices to set an annual benchmark for growth in total healthcare costs in Delaware.[8]

Several months later, then-Governor John Carney signed two executive orders to further the joint resolution's goals. The first executive order established the Health Care Delivery and Cost Advisory Group to explore methods for setting spending and quality benchmarks.[9] The second executive order established the Delaware Economic and Financial Advisory Council Health Care Spending Benchmark Subcommittee (the "Subcommittee"), which was charged with setting the healthcare spending benchmark and annually reviewing the benchmark's

---

[6] *Id.* ¶ 29. In its capacity as sole member of Health Services, Health System has the right to elect the members of Health Services' board of directors. *Id.*

[7] H.J. Res. 7, 149th Gen. Assemb. (Del. 2017), https://legiscan.com/DE/bill/HJR7/2017; *see* Del. R. Evid. 202(d) ("The court may, without request by a party, take judicial notice of . . . resolutions of . . . the General Assembly of this State . . . .").

[8] H.J. Res. 7, 149th Gen. Assemb. (Del. 2017).

[9] Del. Exec. Order No. 19 § 2 (Feb. 21, 2018), https://archivesfiles.delaware.gov /Executive-Orders/Carney/Carney_EO19.pdf.

components.[10]  The Subcommittee's role and the formula to determine the benchmark were later codified in 16 *Del. C.* § 9903(k).[11]

## C.    The Enactment of House Bill 350

For several years, the benchmarks set by the Subcommittee lacked any enforcement mechanism.  That changed in March 2024 when the General Assembly proposed House Bill 350 ("HB 350").[12]  HB 350 sought to impose a new administrative apparatus called the Diamond State Hospital Cost Review Board (the "Review Board") to review and approve hospital budgets based on their adherence to the spending benchmark.[13]  In April, the legislature introduced a substitute version of HB 350 that expanded the Review Board's role to include a mandatory performance improvement plan process for hospitals that exceeded the benchmark.[14]

The Delaware Senate passed the final version of HB 350, as substituted and amended, on May 16, 2024 with a vote of 14-7, and the Delaware House voted 24-

---

[10]    Compl.   ¶ 90;  *see  also*  Exec.  Order  No.  25  (Nov.  20,  2018), https://archivesfiles.delaware.gov/Executive-Orders/Carney/Carney_EO025.pdf.

[11] Compl. ¶ 90; *see* 16 *Del. C.* § 9903(k).

[12] Compl. ¶ 57.

[13] *Id.* ¶¶ 57-58.

[14] *Id.* ¶ 59.

16 in favor (with one absent vote) on May 21.[15] Governor Carney signed the bill into law (the "Act") about three weeks later, on June 13.[16]

### D. The Operation of the Act

Under the Act, the Review Board's stated purpose is to "[c]arry[] out hospital budget reviews and related functions."[17] Generally, the Act applies to non-exempt Delaware hospitals, which are defined broadly by statute.[18] But it specifically exempts hospitals that "exclusively provide psychiatric services or rehabilitative services" and those "that serve[] less than 5% Medicare eligible patients per year or . . . derive[] 45% or more of [their] revenue from Medicaid or uninsured patients."[19] ChristianaCare meets the statutory definition of a hospital and does not meet the exceptions; it falls within the scope of the Act.[20]

The Review Board consists of seven voting members with knowledge of "business, finance, or accounting" appointed by the Governor and confirmed by the

---

[15] *Id.* ¶ 56.

[16] *Id.*; *see* 16 *Del. C.* §§ 9951-59.

[17] Compl. ¶ 72 (quoting 16 *Del. C.* § 9952(a)).

[18] *Id.* ¶ 75; *see* 16 *Del. C.* § 1001 (defining "hospital" as "a health-care organization that has a governing body, an organized medical and professional staff, and inpatient facilities, and provides either medical diagnosis, treatment and care, nursing and related services for ill and injured patients, or rehabilitation services for the rehabilitation of ill, injured or disabled patients 24 hours per day, 7 days per week and primarily engaged in providing inpatient services").

[19] Compl. ¶¶ 75, 77; *see also* 16 *Del. C.* §§ 9951(3), 9959(c).

[20] Compl. ¶ 78.

5

Senate.[21] The President and CEO of the Delaware Healthcare Association also sits on the Review Board as a non-voting member.[22] Members serve four-year terms but may be renominated for additional terms.[23]

Subject to applicable rules and regulations yet to be promulgated, the Review Board can mandate that covered hospitals annually submit information to it. This may include hospitals' operating budgets, financial information (including costs of operations, revenues, assets, liabilities, rates, charges, units of service, and wage, salary, and other labor costs), scope of services, contract, and utilization information, and "[o]ther information [the Review Board] determines to be relevant to the budget review process."[24]

The Act provides that the budget information hospitals share with the Review Board will be posted to a public website.[25] The Review Board must also "convene at least [one] public hearing per hospital [per year] . . . to allow the hospital to present its annual budget[] and performance improvement plan where applicable[]"

---

[21] Compl. ¶¶ 69-70, 116; *see* 16 *Del. C.* § 9952(c)(1).

[22] Compl. ¶ 69.

[23] *Id.* The initial terms may be shorter to create staggered terms. *Id.*

[24] 16 *Del. C.* § 9953; *see* Compl. ¶ 72.

[25] Compl. ¶ 88; *see* 16 *Del. C.* § 9958(b)(2).

6

and give the public an opportunity to comment "on hospital budgets and other aspects of hospital costs."[26]

Beginning in 2026, if the Review Board determines that "a hospital's actual annual cost of growth has exceeded the spending benchmark," it can "require the hospital to submit a performance improvement plan [('PIP')] . . . ."[27]  The Review Board can then accept or reject the hospital's PIP.[28]  If the Review Board either rejects the PIP and cannot agree with the hospital on a revised plan, or accepts the PIP but finds the PIP's implementation unsuccessful, it can require the hospital to participate in a "budget approval process."[29]  Once a hospital is subject to the budget approval process, the Review Board must "engage with the hospital in establishing and approving a modified budget."[30]  If agreement on an acceptable budget cannot be reached, the Review Board has the power to "impose a modified budget" on the hospital.[31]  A hospital "that knowingly fails to provide information or adhere to

---

[26] Compl. ¶¶ 85, 88; *see also* 16 *Del. C.* §§ 9952(d), 9958(c)(1).

[27] 16 *Del. C.* § 9954(a).

[28] Compl. ¶¶ 92, 94.

[29] *Id.* ¶¶ 93-94; 16 *Del. C.* § 9954(d), (f); *see id.* § 9955 (outlining the budget approval process).

[30] Compl. ¶¶ 95, 97; 16 *Del. C.* § 9955(e).

[31] Compl. ¶¶ 95, 97; 16 *Del. C.* § 9955(e).

standards, procedures, and deadlines related to the budget review process . . . may be assessed a civil penalty of up to $500,000."[32]

Once assembled, the Review Board will "promulgate rules and regulations necessary for the implementation of" the Act.[33]  Because the Review Board is not fully empaneled,[34] it has yet to begin enacting rules and regulations to implement the Act.

### E.    Price Caps

The Act also imposes price caps on certain hospitals.  It prohibits subject hospitals from charging "any payer, purchaser, insurer, or public program an amount that exceeds the greater of 2% or Core CPI plus 1% over rates from the previous

---

[32] 16 *Del. C.* § 9957(a); Compl. ¶ 104.

[33] Compl. ¶ 73 (quoting 16 *Del. C.* § 9952(g)).

[34] Then-Governor Carney nominated five of the seven voting Review Board members, who were confirmed by the Senate on December 16, 2024.  Shane Brennan, *Delaware's hospital review board, at center of lawsuit, sees first members approved*, Del. News. J., Dec. 15, 2024, https://www.delawareonline.com/story/news/local/2024/12/16/delaware-hospital-cost-review-board-members-governor-carney-picks.  On February 13, 2025, Governor Matthew S. Meyer nominated the two other voting members.  Press Release, *Governor Meyer Announces Nominees to Hospital Cost Review Board*, Feb. 13, 2025, https://news.delaware.gov/2025/02/13/governor-meyer-announces-nominees-to-hospital-cost-review-board.  The Delaware Senate held a hearing on the nominations on March 12, but did not move the nominations forward for a full confirmation vote.  Nick Stonesifer, *Delaware hospital review board holds first meeting as lawsuit looms*, Del. News. J., Mar. 18, 2025, https://www.delawareonline.com/story/news/2025/03/18/delaware-hospital-review-board-meeting-lawsuit-christianacare/82492463007.

year," effective from January 1, 2025 to December 31, 2026.[35] ChristianaCare is currently subject to the price caps.

Like the rest of the Act, Delaware hospitals "that serve[] less than 5% Medicare eligible patients per year or . . . derive[] 45% or more of [their] revenue from Medicaid or uninsured patients" are exempt from the price caps.[36] Out-of-state competitor hospitals are also immune.[37] Because the caps are placed on providers rather than services, ChristianaCare's competitors can provide services outside the hospital setting without restriction.[38]

### F. This Litigation

On July 29, 2024, ChristianaCare sued the members of the Review Board and certain government officials.[39] On November 13, it filed the operative amended Complaint, which reflects HB 350's enactment into law.[40] ChristianaCare alleges

---

[35] Compl. ¶¶ 108, 110; *see also* 16 *Del. C.* § 9959(a). "Core CPI" is a measurement of aggregate consumer prices calculated by the United States Bureau of Labor Statistics, constituting a "typical basket of goods, excluding food and energy." Fed. Reserve Bank of St. Louis, *Consumer Price Index for All Urban Consumers: All Items Less Food and Energy in U.S. City Average (CPILFESL)*, https://fred.stlouisfed.org/series/CPILFESL (last visited May 22, 2025).

[36] Compl. ¶ 111; *see also* 16 *Del. C.* § 9959(c).

[37] Compl. ¶ 109.

[38] *Id.*

[39] Dkt. 1.

[40] Dkt. 30.

that the Act violates the Delaware Constitution.[41]  It also asserts that the Act violates multiple provisions of the United States Constitution.[42]  As relief, it seeks declarations that the Act is unlawful and an order permanently enjoining the Act's enforcement.

The defendants moved to dismiss the Complaint on November 25.[43]  Once briefing was complete,[44] I held oral argument on February 11, 2025.[45]  The motion to dismiss was taken under advisement.

## II.    ANALYSIS

The defendants argue that dismissal is warranted on several grounds.

To begin, the defendants make two jurisdictional arguments.  First, they seek dismissal under Rule 12(b)(1), asserting that the action falls outside the Court of Chancery's limited subject matter jurisdiction.  Second, they maintain that the action is unripe.  On a motion to dismiss under Rule 12(b)(1), the court must take the allegations in the complaint as true and construe all reasonable inferences in the non-

---

[41] Compl. ¶¶ 145-46, 159-61.

[42] *Id.* ¶¶ 166-226.

[43] Opening Br. in Supp. of Defs.' Mot. to Dismiss Verified Am. Compl. for Decl. and Inj. Relief (Dkt. 35) ("Defs.' Opening Br.").

[44] *See* Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss (Dkt. 36) ("Pls.' Answering Br."); Reply Br. in Further Supp. of Defs.' Mot. to Dismiss Verified Am. Compl. for Decl. and Inj. Relief (Dkt. 39) ("Defs.' Reply Br.").

[45] Dkt. 41; Tr. of Feb. 10, 2025 Oral Arg. on Defs.' Mot. to Dismiss (Dkt. 42) ("Hr'g Tr.").

10

movant's favor.[46]  Dismissal will be granted if "it appears to a reasonable certainty that under no state of facts which could be proved would [the plaintiffs] be entitled to relief."[47]

The remainder of the defendants' motion challenges the viability of ChristianaCare's claims under Court of Chancery Rule 12(b)(6).  These arguments are governed by the reasonable conceivability standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[48]

I begin by determining that this action falls within the Court of Chancery's subject matter jurisdiction.  I next conclude that most of ChristianaCare's claims are unripe, except for two.  One of these claims—regarding the validity of price caps under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution—is dismissed for failure to state a claim.  The other claim, which concerns the validity of the Act under Article IX, Section 1 of the Delaware Constitution, survives.

---

[46] *See de Adler v. Upper N.Y. Inv. Co.*, 2013 WL 5874645, at *7 (Del. Ch. Oct. 31, 2013).

[47] *Haman v. Masoneilan Int'l Inc.*, 442 A.2d 487, 502 (Del. 1982).

[48] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citation omitted).

11

## A.    Subject Matter Jurisdiction

"The Court of Chancery is proudly a court of limited jurisdiction."[49]  Subject matter jurisdiction is present only if "(1) one or more of the plaintiff's claims for relief is equitable in character, (2) the plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute."[50]  This case arguably falls within each category.

First, ChristianaCare seeks to enforce its equitable rights and those of its Boards.[51]   Second, ChristianaCare requests injunctive relief.[52]   And third, ChristinaCare's claims "require[] [the court] to interpret and apply the Delaware General Corporation Law [('DGCL')]" and ChristianaCare's certificates of incorporation, which falls within the court's statutory jurisdiction.[53]  In Count I, for example, ChristianaCare asks the court to interpret and apply the charters of Health

---

[49] *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *4 (Del. Ch. June 27, 2019).

[50] *Candlewood Timber Gr., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004) (citing 10 *Del. C.* §§ 341-42).

[51] 10 *Del. C.* § 341.

[52] Compl. 77 (requesting "[a]n order preliminarily and permanently enjoining [d]efendants from enforcing the Act").

[53] *L. Debenture Tr. Co. of N.Y. v. Petrohawk Energy Corp.*, 2007 WL 2248150, at *5 n.11 (Del. Ch. Aug. 1, 2007), *aff'd*, 947 A.2d 1121 (Del. 2008); *see* 8 *Del. C.* § 111(a)(1) (providing the court with jurisdiction to "interpret, apply, enforce or determine the validity of the provisions of . . . [t]he certificate of incorporation or the bylaws of a corporation"); *id.* § 111(b) (providing the court with jurisdiction to "interpret, apply or enforce any provision of [the DGCL]").

12

Services and Health Systems (the "Charters") in evaluating whether the Act is unconstitutional.[54]

The defendants' motion to dismiss on this basis is denied.

### B.    Ripeness

The defendants next argue that ChristianaCare's challenge to the Act is unripe.[55] They point out that, since the Review Board remains unassembled, it has not—and cannot—issue implementing regulations.[56]

"Ripeness, the simple question of whether a suit has been brought at the correct time, goes to the very heart of whether a court has subject matter jurisdiction."[57] "Delaware courts 'typically decline to decide issues that may not have to be decided or that create hypothetical harm.'"[58] The point of ripeness doctrine is to prevent the exercise of jurisdiction that would "result in the rendering of an advisory or hypothetical opinion."[59]

---

[54] Compl. ¶¶ 148-52.

[55] Defs.' Opening Br. 16-20.

[56] *See supra* notes 33 and accompanying text.

[57] *Hill v. LW Buyer, LLC*, 2019 WL 3492165, at *9 (Del. Ch. July 31, 2019) (citing *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. 2006)).

[58] *Id.* (citing *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013)).

[59] *Solak v. Sarowitz*, 153 A.3d 729, 736 (Del. Ch. 2016).

"[A] dispute will be deemed not ripe where the claim is based on 'uncertain and contingent events' that may not occur, or where 'future events may obviate the need' for judicial intervention."[60] Many of ChristianaCare's claims suffer from these defects because they rest on a shifting foundation. The Complaint highlights the Act's alleged vagueness and imprecision.[61] For example, ChristianaCare's due process claim concerns the General Assembly's purported failure "to define penal

---

[60] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217-18 (Del. 2014) (first citing *Bebchuk*, 902 A.2d at 740; then citing *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 631-32 (Del. Ch. 2005), *rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006)).

[61] *See* Compl. ¶ 14 (noting the "vague and undefined penal provisions in a manner that encourages arbitrary and discriminatory enforcement"); *id* ¶ 74 ("This grant of power is, by design, vaguely and loosely defined in a manner that invites arbitrary rulemaking and the exercise of unbounded regulatory authority."); *id.* ¶ 86 (describing the Review Board's review process, as described in the Act, as an "unconstitutionally vague morass of discretion"); *id.* ¶ 95 n.9 (noting that the Act's requirement that a hospital budget "reflect[] growth equal to or less than the spending benchmark" does not define "growth"); *id.* ¶ 103 (noting that "the requirements for imposing penalties are vague and undefined"); *id.* ¶ 104 (explaining that, though the Act considers a "civil penalty of up to $500,000" if a hospital "knowingly fails to provide information or adhere to standards, procedures, and deadlines related to the budget review process," it does not specify how the Review Board will determine such failure was "knowing" and does not define "standards" or "procedures"); *id.* ¶ 105 (noting that, in allowing the Review Board to impose penalties for failing to "maintain" its approved budget, the Act fails to define "maintain" and "does not address how a hospital would adhere to an 'approved' budget impacting a multi-year contractual obligation"); *id.* ¶ 114 (noting that what constitutes a "final decision" giving rise to an "appeal" is left undefined); *id.* ¶ 212 (describing the undefined aspects of the plan that make it so "ChristianaCare . . . cannot understand what conduct will subject it to the penalty of a [PIP] plan"); *id.* ¶ 214 (again noting the insufficient description regarding what constitutes "maint[enance]" of the approved budget); *id.* ¶ 215 (again noting the insufficient detail around the circumstances that may empower the Review Board to assess the $500,000 civil penalty); *id.* ¶ 216 (again noting the uncertainty around what constitutes a "final" decision subject to appeal).

14

statutes with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[62] But the Review Board has yet to fulfill its legislative mandate to "promulgate rules and regulations necessary for the implementation of" the Act.[63] That cannot happen at least until the Review Board's final two members are confirmed by the Senate.[64] Until the regulations are promulgated and imminently effective, the potential harm to ChristianaCare is indefinite.[65]

---

[62] Compl. ¶ 211 (citing *Sackett v. EPA*, 598 U.S. 651, 680 (2023)).

[63] 16 *Del. C.* § 9952(g); *see supra* note 33 and accompanying text.

[64] *See supra* note 34 and accompanying text (providing details on the status of the nomination and confirmation process).

[65] The defendants argue that:

> [p]atience is particularly appropriate here considering: (1) the core of the Review Board's enforcement process will not begin until 2026; (2) the exercise of the Review Board's enforcement authority is contingent on a string of hypothetical noncompliance; and (3) the only penalty under the Act is a civil fine that equates to roughly 0.01% of Christiana's annual budget.

Defs.' Opening Br. 19. Only the first point bears on the ripeness of this suit, however. In the seminal case of the *Abbott Laboratories v. Gardner*, the United States Supreme Court held that federal regulations with "the status of law" and for which "violations . . . carr[ying] heavy . . . sanctions" had a "sufficiently direct and immediate [impact so] as to render the issue appropriate for judicial review." 387 U.S. 136, 152 (1967). The same rationale applies to state regulations, which would allow ChristianaCare to challenge the statute and/or regulations regardless of whether its actual effect would depend on hypothetical noncompliance. *See Am. Ins. Ass'n v. Del. Dep't of Ins.*, 2006 WL 3457623, at *2 (Del. Super. Nov. 29, 2006) (permitting "pre-enforcement review of a challenged regulation" where judicial review would "avoid[] the Hobson's choice of complying with a potentially invalid regulation or violating the regulation in order to challenge it"). As to the third point, even if the only harm to ChristianaCare is the risk of a civil penalty, none of its constitutional challenges turn on the size of the penalty.

15

ChristianaCare also pleads that, since "capital investment decisions must be made years in advance, . . . capital budgeting decisions made today will have a substantial impact on ChristianaCare's ability to meet cost benchmarks that may be set by the [Review Board] in the future."[66] As a result, ChristianaCare avers that it and its Boards "are currently impacted by the adoption of the Act."[67] Still, the benchmark for future years is not set. And when it may be set is unknown, given the incomplete Review Board and absence of implementing regulations.

I do not take lightly the difficulties ChristianaCare may face in setting a forward-looking budget amid the looming uncertainty. On balance, though, any harm to ChristianaCare is outweighed by the substantial risks and impracticalities of judging the Act's merits using incomplete facts.[68]

Most of ChristianaCare's claims under the Delaware and United States Constitutions are presently unfit for judicial resolution. Counts 2, 3, 4, 5, 7, and 8, as well as Count 6 insofar as it concerns the Review Board's budget review process,

---

[66] Compl. ¶ 25.

[67] *Id.*

[68] *See XL Specialty*, 93 A.3d at 1217 (explaining that the ripeness determination weighs the need for "immediate relief" against "the concerns of the court 'in postponing review until the question arises in some more concrete and final form'" (quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989))).

are unripe challenges to the Act's implementation. They are therefore dismissed without prejudice.[69]

Two counts are fit for judicial resolution, however. In Count 1, ChristianaCare contends that the Act was invalidly enacted due to noncompliance with Article IX, Section 1 of the Delaware Constitution.[70] If the legislature's authority was invalidly delegated, the Act could never operate lawfully.[71] In Count 6, ChristianaCare asserts that the Act exempts certain types of hospitals from price caps in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[72] These price caps are currently in effect and have an immediate negative effect on ChristianaCare's operations.[73]

The remainder of this opinion addresses ChristianaCare's two ripe claims.

---

[69] The defendants argue that "the Court must resolve any doubts as to constitutionality in favor of the enactment." Defs.' Mot. to Dismiss 18 (citing *Op. of the Justs.*, 385 A.2d 695, 709 (Del. 1978) and *Pardo v. State*, 160 A.3d 1136, 1142 n.15 (Del. 2017)). Perhaps. But it is more appropriate to dismiss ChristianaCare's unripe claims without prejudice rather than weigh in on the merits. *See, e.g.*, *Hill*, 2019 WL 3492165, at *10 (dismissing unripe claims without prejudice); *Kilcullen v. Spectro Sci., Inc.*, 2019 WL 3074569, at *9 (Del. Ch. July 15, 2019) (same); *Horton v. Organogenesis Inc.*, 2019 WL 3284737, at *4 (Del. Ch. July 22, 2019) (same).

[70] Compl. ¶¶ 144-56.

[71] Hr'g Tr. 9 (defense counsel acknowledging that a facial challenge to the law is ripe); *see Del. Bd. of Med. Licensure and Discipline v. Grossinger*, 224 A.3d 939, 956 (Del. 2020) (explaining that "[a] facial challenge alleges that a statute or regulation is not valid under any set of circumstances").

[72] Compl. ¶¶ 196-201.

[73] *See supra* note 35 and accompanying text.

## C. Validity of the Act Under Article IX, Section 1

In Count 1, ChristianaCare alleges that the Act is void *ab initio* because it contravenes Article IX, Section 1 of the Delaware Constitution.[74] Article IX limits the legislature's power to interfere with the internal governance of Delaware corporations. To that end, Section 1 first provides that:

> No corporation shall hereafter be created, amended, renewed or revived by special act, but only by or under general law, nor shall any existing corporate charter be amended, renewed or revived by special act, but only by or under general law.[75]

It further states that "[n]o general incorporation law, nor any special act of incorporation, shall be enacted without the concurrence of two-thirds of all the members elected to each House of the General Assembly."[76]

ChristianaCare advances two theories on how the Act violates Article IX. First, it claims that the Act targets a select group of corporations, making it a prohibited special act.[77] Second, and alternatively, it claims that the Act is void as a corporation law because it failed to secure the two-thirds approval in both legislative

---

[74] Compl. ¶¶ 144-56; Pls.' Answering Br. 13-14.

[75] Del. Const. art. IX, § 1; Compl. ¶ 145.

[76] Del. Const. art. IX, § 1; Compl. ¶ 146.

[77] Compl. ¶¶ 148-52.

chambers required by Article IX.[78]  For the reasons explained below, both theories

pass muster at this stage of the litigation.

### 1.    Special Act Versus General Act

Historically, forming a corporation required an act of the legislature for each

individual company charter.[79]    The process was cumbersome, corrupt, and

expensive.[80]  In 1897, the Delaware Constitutional Convention agreed to eliminate

the special act process and add Article IX to the Delaware Constitution.[81]  In 1899,

the Delaware legislature adopted the DGCL as a "general" act, consistent with

Article IX.[82]

As this history reveals, the bar on special acts is a cornerstone of Delaware

corporate law.[83]  Over time, the terms "'[g]eneral' and 'uniform' as applied to laws

---

[78] *Id.* ¶¶ 153-54 (noting that the Act passed the House by a 60% vote).

[79] Samuel Arsht, *A History of Delaware Corporate Law*, 1 Del. J. Corp. L. 1, 2-5 (1976) (discussing the process for incorporating via special act during the period from 1776 to 1899).

[80] *Id.* at 4 (noting that "[t]he procedure for incorporating [via special act] was both cumbersome and time-consuming"); *id.* at 5-6 (explaining that the special act incorporation process was eliminated because of "the expense and corruption attendant upon the procedure"); *see also id.* at 7 (noting that passing the DGCL as a general act had "[t]wo immediate benefits": (1) "the time of the legislature (and the concomitant expense) would no longer be taken up by the consideration of special incorporation laws" and (2) "the legislature would no longer be subjected to the untoward pressures of lobbyists").

[81] *Id.* at 6.

[82] *Id.* at 6-7.

[83] *See supra* note 75 and accompanying text.  The Delaware Constitution includes limited exceptions for "municipal corporations, banks, or corporations for charitable, penal, reformatory, or educational purposes, sustained in whole or in part by the State."  Del.

have [developed] a well-defined and generally accepted meaning as antithetical to 'special' or 'discriminatory.'"[84] A "law is general and uniform if all persons in the same circumstances are treated alike."[85] A "special" law, by contrast, "is one which relates and applies to particular members of a class, either particularized by the express terms of the act or separated by any method of selection from the whole class to which the law might, but for such limitation, be applicable."[86]

ChristianaCare contends that the Act is a special act under these definitions.[87] The Act does not treat all Delaware corporations—or even all hospitals—alike; it applies to only hospital corporations meeting certain criteria.[88]

The defendants, for their part, argue that the Act is not "special" because it applies to all full-service hospitals falling within the statutory definition rather than

---

Const. art. IX, § 1; *see also, e.g.*, *City of Newark v. Weldin*, 1987 WL 7536, at *2 (Del. Ch. Feb. 20, 1987) ("[T]he City's charter is a special act of incorporation"); *Silverbrook Cemetery Co. v. Dep't of Fin. of New Castle Cnty.*, 449 A.2d 241, 242 (Del. 1982) ("Silverbrook was granted corporate status by a special act of incorporation of the General Assembly in 1895."); *Op. of the Justs.*, 276 A.2d 736, 740 (Del. 1971) ("The last basic Charter of Wilmington . . . is a special act of incorporation.").

[84] *State ex rel. Morford v. Tatnall*, 21 A.2d 185, 189 (Del. 1941).

[85] *Id.*

[86] *Op. of the Justs.*, 252 A.2d 164, 165 (Del. 1969) (citation omitted).

[87] Compl. ¶ 148.

[88] Pls.' Answering Br. 15; Compl. ¶¶ 135-36, 203-04; *see* 16 *Del. C.* §§ 9951(3), 9959(c).

20

singling out an individual corporation.[89] They maintain that the Act merely affects some corporations more than others.[90]

The divergence in the parties' arguments turns on how one frames special versus general acts. To ChristianaCare, an Act that applies to all corporations is general and one that targets a class of corporations is special. To the defendants, a special act singles out a specific entity while a general act can apply to a class of corporations.

I need not definitely resolve this interpretative question at the present procedural posture. On a motion to dismiss, I must only decide whether ChristianaCare's theory is viable. Article IX is directed at all corporations chartered in Delaware. Delaware courts have referred to special laws as those that apply to plural "members" or "persons."[91] It is therefore reasonably conceivable that the Act is a special act that treats certain hospital corporations differently from other Delaware corporations.

---

[89] Defs.' Opening Br. 24-25.

[90] *Id.* at 24.

[91] *Op. of the Justs.*, 252 A.2d at 165 ("A 'special' law is one which 'relates and applies to particular *members* of a class, either particularized by the express terms of the act or separated by any method of selection from the whole class to which the law might, but for such limitation be applicable.'" (citation omitted) (emphasis added)); *Tusso v. Smith*, 156 A.2d 783, 786 (Del. Ch. 1959) (defining "a special law as: '[o]ne relating to particular *persons or things*; one made for individual cases or for particular places or districts'" (quoting Black's Law Dictionary) (emphasis added)).

## 2. Implicit Charter Amendment

In the alternative, ChristianaCare asserts that even if the Act were a general act—as the defendants argue—it is facially invalid because it was enacted "without the concurrence of two-thirds of all the members elected to each House of the General Assembly" required by Article IX.[92]

In Delaware, a corporate charter serves as a contract between the State and the entity, along with the corporation's officers, directors, and stockholders.[93] Under Section 394 of the DGCL, the terms of this contract incorporate by reference every DGCL provision.[94] The parties to a corporate charter—like any contract—are bound by its terms, unless the contract permits amendment.

Section 394 reserves for the legislature the right to amend a charter through an amendment to the DGCL.[95] Given the implicit power that this provision gives the State over corporate charters, Article IX of the Delaware Constitution acts as a guardrail by requiring supermajority approval of any DGCL amendment.[96] This

---

[92] *See supra* note 76 and accompanying text.

[93] *See Lawson v. Household Fin. Corp.*, 152 A. 723, 727 (Del. 1930) ("[T]he charter of a corporation is a contract both between the corporation and the state and [between] the corporation and its stockholders.").

[94] 8 *Del. C.* § 394 ("[The DGCL] and all amendments thereof shall be part of the charter or certificate of incorporation of every corporation . . . .").

[95] *Id.* (providing that the DGCL "may be amended or repealed, at the pleasure of the General Assembly").

[96] Del. Const. art. IX, § 1; Compl. ¶ 5.

limitation accords with *Trustees of Dartmouth College v. Woodward*, where the United States Supreme Court held that a state could not unilaterally change a corporate charter under Article I, Section 10 of the United States Constitution, which bars state interference with contract.[97]

ChristianaCare maintains that the Act impairs the board-centric governance model supplied by its Charters and the DGCL. The State granted the Boards the exclusive authority to manage ChristianaCare's business and affairs for the charitable purposes the Charters delineated.[98] Section 141 of the DGCL, which is incorporated into the Charters, vests boards of directors with the sole authority to manage a corporation's business and affairs—requiring that any exception be set out in the DGCL or the corporation's charter.[99] Indeed, it is a "bedrock" principle of Delaware law that "the business and affairs of a corporation are managed by and under the direction of its board."[100]

---

[97] 17 U.S. 518, 655-59 (1819); *see* U.S. Const. art. I, § 10 ("No State shall . . . pass any . . . [l]aw impairing the [o]bligation of [c]ontracts . . . ."); *see also Dartmouth*, 17 U.S. at 558 (holding that a state legislature could not instill a political oversight board to review and approve fiscal decisions of a corporate board because a law "tak[ing] away from one the rights, property, and franchises, and . . . grant[ing] them to another" is not a proper "exercise of . . . legislative power").

[98] Compl. ¶¶ 3, 29-30, 122-23.

[99] 8 *Del. C.* § 141(a).

[100] *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984); *see also Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996) (affirming the lower court's judgment that a board did not abdicate its directorial duties by delegating certain responsibilities to an employee because it "retain[ed] the ultimate freedom to direct the strategy and affairs of the [c]ompany"); *Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291 (Del. 1998) ("One of the most

Delaware courts have recognized that setting a corporate budget is central to the board's purview, allowing the board to allocate resources to support its strategic goals and objectives.[101] According to ChristianaCare, the Act displaces its Boards' authority over this important function by giving the Review Board ultimate authority to oversee and alter budgets.[102] In this way, ChristianaCare argues, the Act is an implicit amendment to the DGCL that failed to garner the requisite legislative approval, making it invalid.[103]

The defendants reject this contention, arguing that the scope of authority delegated to corporate boards under Section 141(a) is "subject to a critical statutory floor" of State-imposed regulations.[104] They emphasize that the legislature can regulate corporate actions, subject to state and federal constitutional limits. Although this is true, the active role that the Act fashions for the Review Board in overseeing—and even overriding—the judgment of applicable hospital boards goes beyond mere regulation.

---

basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation.").

[101] *In re Bally's Grand Deriv. Litig.*, 1997 WL 305803, at *5-6 (Del. Ch. June 4, 1997) (holding that it was reasonably conceivable that a board's delegation of budgeting power under a management agreement amounted to abdication of its directorial duties).

[102] Compl. ¶¶ 11, 62, 149.

[103] *Id.* ¶¶ 12, 56, 153-54.

[104] Defs.' Reply Br. 14 (quoting *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011)).

ChristianaCare has put forward a reasonably conceivable claim that the Act impermissibly amends its Charters by transferring the Boards' authority over strategic budget decisions to the Review Board, in contravention of Section 141(a). It adequately pleads that the Act improperly constrains the authority of hospital boards, including the discretion to allocate corporate resources in compliance with validly adopted regulations. Delaware courts have held that the supermajority voting requirement in Article IX must be adhered to if legislation amends a corporate charter "by necessary implication," even if it lacks "any express reference" to the charter or the DGCL.[105] But the Act did not receive the constitutionally-mandated vote. The defendants' motion to dismiss Count 1 is therefore denied.

## D. Equal Protection Challenge to Price Caps

In Count 6, ChristianaCare asserts that several aspects of the Act violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[106] As discussed above, some aspects of this count are unripe.[107] The

---

[105] *See, e.g.*, *Op. of the Justs.*, 276 A.2d at 739 ("There may be a charter amendment by necessary implication as well as by express reference."); *see also City of Newark*, 1987 WL 7536, at *4 (holding that legislation would constitute an "implied amendment" to a corporate charter if the legislation were "construed to supervene or control the clear and specific terms" of the charter).

[106] Compl. ¶ 197 (alleging that "Sections 2, 3, and 5 of the Act—specifically, the Sections adding 16 *Del. C.* §§ 9952, 9953, 9954, 9955, 9956, 9957, and 9959—violate the Equal Protection Clause").

[107] *See supra* Section II.C (concluding that the aspects of Count 6 focused on the Review Board's budget review process are unripe).

portion that addresses price caps, though, is ripe because ChristianaCare is already subject to them.

Under the Fourteenth Amendment, "[n]o [s]tate shall . . . deny to any person within its jurisdiction the equal protection of the laws."[108] "The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike."[109]

ChristianaCare claims that the Act contravenes this requirement by applying onerous price caps to certain hospitals while exempting others operating in the same competitive marketplace.[110] For example, one hospital system (ChristianaCare) is subject to price caps but another (Nemours) is not, even though both provide pediatric services.[111] More broadly, ChristianaCare identifies three groups that are exempt from the price caps: (1) pediatric hospitals that "serve less than 5% Medicare eligible patients" as well as hospitals that "derive 45% or more of their revenue from Medicaid or uninsured patients" are not subject to the Act's temporary pricing measures;[112] (2) non-hospital healthcare providers and hospitals that provide only

---

[108] U.S. Const. amend. XIV § 1.

[109] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

[110] Compl. ¶¶ 200-03, 207; *see also id.* ¶ 77.

[111] *Id.* ¶ 201.

[112] *Id.* ¶¶ 199-200.

26

rehabilitative or psychiatric care are not subject to the Act;[113] and (3) "non-healthcare corporations that provide goods and services" are not subject to the Act.[114]

"In any equal protection case, the threshold issue is the standard of review to be applied to the government action in question."[115] Unless the discrimination is based on a "suspect classification" such as race or national origin, the applicable standard is "rational basis" review.[116] "Discrimination against those who have suffered economic injury generally does not implicate a suspect classification."[117] Since the discrimination ChristianaCare complains of is a purported arbitrary preference for some care facilities over others, no suspect classification is implicated and rational basis review applies.[118]

---

[113] *Id.* ¶¶ 201-02.

[114] *Id.* ¶ 203.

[115] *Turnbull v. Fink*, 668 A.2d 1370, 1379 (Del. 1995).

[116] *Id.*

[117] *Id.*

[118] ChristianaCare appears to concede in its Complaint that rational basis review applies. *See, e.g.*, Compl. ¶¶ 199 ("Even when discriminatory treatment does not involve a protected classification, the Equal Protection Clause still requires that the reasons for treating two groups differently be *rationally* related to a legitimate government interest." (emphasis added)); *id.* ¶ 201 ("For example, *without any rational basis*, the Act arbitrarily carves Nemours out of the price-cap provisions of the Act by exempting hospitals that serve less than 5% Medicare eligible patients. ChristianaCare, like Nemours, provides pediatric services and a neonatal intensive care unit (NICU). *There is no rational basis* for exempting Nemours' pediatric and NICU services from price caps while subjecting ChristianaCare's identical services to them." (emphasis added)); *id.* ¶ 206 ("There is no legitimate governmental interest that justifies treating these groups differently. And the

Rational basis review is a permissive standard under which "governmental action enjoys a presumption of constitutionality and 'statutory classifications will be set aside only if no grounds can be conceived to justify them.'"[119] To overcome this "strong presumption of validity," a plaintiff must show "the absence of 'a rational relationship between the disparity of treatment and some legitimate governmental purpose.'"[120] "[I]f there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification," the challenge fails.[121]

The defendants cite at least one rational basis for treating full-service hospitals differently than other healthcare providers: that large full-service hospitals like ChristianaCare inherently make outsized contributions to healthcare costs.[122]

---

manner of differential treatment is *not rationally related* to such an interest." (emphasis added)).

It seems to reverse course in its answering brief by suggesting that strict scrutiny is the applicable legal standard because "the Act's disparate treatment affects fundamental rights, such as free speech." Pls.' Answering Br. 48 (citing *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). Putting aside this pleading inconsistency, ChristianaCare's characterization of the rule is overbroad. The precedent that ChristianaCare relies on applies to equal protection challenges in the voting rights context. *See Clark*, 486 A.2d at 461 (citing *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 672 (1966)). The fact that ChristianaCare also brings a First Amendment claim does not mean that strict scrutiny applies to its equal protection claim regarding price caps that are not alleged to implicate free speech concerns.

[119] *State v. Robinson*, 417 A.2d 953, 961-62 (Del. 1980) (citing *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 809 (1969)).

[120] *Burroughs v. State*, 304 A.3d 530, 544 (Del. 2023) (quoting *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)).

[121] *Id.* (quoting *Heller*, 509 U.S. at 320) (emphasis added).

[122] Defs.' Opening Br. 49.

28

One can envision similar justifications for the other differential treatments ChristianaCare identifies. Perhaps the State has deemed children's health to be of higher value for actuarial or other policy reasons, making it less inclined to regulate healthcare spending for this population.[123] It could also be that the State is willing to allow greater healthcare spending for providers servicing needier populations— or that it is less concerned with spending where most costs are reimbursed by Medicaid.[124]

The General Assembly's rationale for these carve-outs from the Act is not expressed in the legislative history. But under the Tenth Amendment of the United States Constitution, states enjoy broad police power to regulate the health and welfare of their citizens.[125] That logically includes the freedom to impose disparate restrictions on healthcare spending for different populations.

---

[123] *See* Compl. ¶ 201 (noting that the price caps do not apply to "hospitals that serve less than 5% Medicare eligible patients," including Nemours).

[124] *See id.* ¶ 202 (noting that the price caps do not apply to "hospitals that derive 45% or more of their revenue from Medicaid or uninsured patients," which "[u]pon information and belief" was intended to exclude St. Francis Hospital).

[125] *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535-36 (2012) ("The Constitution may restrict state governments—as it does, for example, by forbidding them to deny any person the equal protection of the laws. But where such prohibitions do not apply, state governments do not need constitutional authorization to act . . . Our cases refer to this general power of governing, possessed by the States but not by the Federal Government, as the 'police power.'"); *see also* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

As a result, I decline ChristianaCare's invitation to strike down the price caps under the Equal Protection Clause. This claim in Count 6 is dismissed with prejudice.[126]

## III. CONCLUSION

For the reasons explained above, the motion to dismiss Count 1 is denied. Count 6 is dismissed with prejudice as to the price caps currently in effect. All other claims—including Count 6 with respect to the imposition of the Review Board—are dismissed without prejudice as unripe.

---

[126] To be clear, ChristianaCare is free to raise an equal protection claim about the budget review process after implementing regulations are promulgated. *See supra* Section II.C (explaining that these claims are dismissed without prejudice as unripe).